UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

SHERRYL R. GRIMSTEAD,

                Plaintiff,

v.                                          Case No.  5:06-cv-240-Oc-10GRJ

MICHAEL J. ASTRUE,[1]
Commissioner of Social Security

                Defendant.
_____/

## REPORT AND RECOMMENDATION[2]

Plaintiff appeals to this Court from a final decision of the Commissioner of Social Security (the "Commissioner") denying her application for a period of disability and disability insurance benefits. (Doc. 1.) The Commissioner has answered (Doc. 6) and both parties have filed briefs outlining their respective positions. (Docs. 12 & 13.)  For the reasons discussed below, the Commissioner's decision is due to be **REVERSED AND REMANDED**.

## I. PROCEDURAL HISTORY

Plaintiff filed an application for a period of disability and disability insurance benefits on April 4, 2002. (R. 21-23.) Plaintiff's application was denied initially (R. 16-

---

[1] On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue should be substituted, therefore, for Commissioner Jo Anne B. Barnhart as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2] Specific written objections may be filed in accordance with 28 U.S.C. § 636, and Rule 6.02, Local Rules, M.D. Fla., within ten (10) days after service of this report and recommendation.  Failure to file timely objections shall bar the party from a *de novo* determination by a district judge and from attacking factual findings on appeal.

17), and upon reconsideration. (R13-14.) Thereafter, Plaintiff timely pursued her administrative remedies available before the Commissioner, and requested a hearing before an Administrative Law Judge ("ALJ"). (R. 12.) The ALJ Phillip C. Lyman conducted Plaintiff's administrative hearing on October 13, 2004 (R. 805-849) and issued a decision unfavorable to Plaintiff on March 15, 2005. (R. 4H-4W.) The Appeals Council denied Plaintiff's request for review on May 18, 2006. (R. 4B-4D.)  The complaint was filed in this Court on July 14, 2006.

## II. <u>STANDARD OF REVIEW</u>

The Commissioner's findings of fact are conclusive if supported by substantial evidence.[3] Substantial evidence is more than a scintilla, i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.[4]

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.[5] The district court must view the evidence as a whole, taking

---

[3] <u>See</u> 42 U.S.C. § 405(g).

[4] <u>Foote v. Chater</u>, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing <u>Walden v. Schweiker</u>, 672 F.2d 835, 838 (11th Cir. 1982) and <u>Richardson v. Perales</u>, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)); *accord,* <u>Edwards v. Sullivan</u>, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

[5] <u>Edwards</u>, 937 F.2d at 584 n.3; <u>Barnes v. Sullivan</u>, 932 F.2d 1356, 1358 (11th Cir. 1991).

into account evidence favorable as well as unfavorable to the decision.[6] However, the district court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law.[7]   The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months.[8]  The impairment must be severe, making Plaintiff unable to do her previous work, or any other substantial gainful activity which exists in the national economy.[9]

The ALJ must follow five steps in evaluating a claim of disability.[10]  First, if a claimant is working at a substantial gainful activity, she is not disabled.[11] Second, if a claimant does not have any impairment or combination of impairments which significantly limit her physical or mental ability to do basic work activities, then she does

---

[6] Foote, 67 F.3d at 1560; *accord,* Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (finding that the court also must consider evidence detracting from evidence on which the Commissioner relied).

[7] Keeton v. Dep't Health and Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

[8] 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505.

[9] 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

[10] 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991).

[11] 20 C.F.R. § 404.1520(b).

not have a severe impairment and is not disabled.[12] Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled.[13] Fourth, if a claimant's impairments do not prevent her from doing past relevant work, she is not disabled.[14] Fifth, if a claimant's impairments (considering her RFC, age, education, and past work) prevent her from doing other work that exists in the national economy, then she is disabled.[15]

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff.[16] The burden then temporarily shifts to the Commissioner to demonstrate that "other work" which the claimant can perform currently exists in the national economy.[17] The Commissioner may satisfy this burden by pointing to the grids for a conclusive determination that a claimant is disabled or not disabled.[18]

However, the ALJ should not exclusively rely on the grids when the claimant has a non-exertional impairment which significantly limits his or her basic work skills or when

---

[12] 20 C.F.R. § 404.1520(c).

[13] 20 C.F.R. § 404.1520(d).

[14] 20 C.F.R. § 404.1520(e).

[15] 20 C.F.R. § 404.1520(f).

[16] Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987). See also Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001).

[17] Doughty at 1278 n.2 ("In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform. In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.") (internal citations omitted).

[18] Walker at 1002 ("[T]he grids may come into play once the burden has shifted to the Commissioner to show that the claimant can perform other work.")

the claimant cannot perform a full range of employment at the appropriate level of exertion.[19] In a situation where both exertional and non-exertional impairments are found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment.[20]

The ALJ may use the grids as a framework to evaluate vocational factors so long as he introduces independent evidence of the existence of jobs in the national economy that the claimant can perform.[21] Such independent evidence may be introduced by a vocational expert's testimony, but this is not the exclusive means of introducing such evidence.[22] Only after the Commissioner meets this burden does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner.[23]

### III.  SUMMARY OF THE EVIDENCE

Plaintiff was born on October 28, 1956 and was forty eight (48) years old at the time of the decision. (R. 818.) Plaintiff has two years of college education in accounting (R. 820) and past relevant work as a clerk at a small store, deli clerk, office clerk, shipping clerk, office clerk at a print shop, factory worker, bookkeeping clerk,

---

[19] Phillips v. Barnhart, 357 F. 3d 1232, 1243 (11th Cir. 2004); Wolfe v. Chater, 86 F.3d 1072, 1077 (11th Cir. 1996); Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Walker at 1003 ("the grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation").

[20] Walker at 1003.

[21] Wolfe at 1077-78.

[22] See id.

[23] See Doughty at 1278 n.2.

bookkeeper and telephone solicitor. (R. 32, 42-48.)[24] Plaintiff contends that she became disabled on June 15, 2001 due to anxiety, an obsessive thought disorder, panic attacks, rosacea, bronchitis, high blood pressure, a post traumatic stress disorder and black outs. (R. 31.)

The ALJ found that Plaintiff's anxiety-related disorder, depression, coronary artery disease, and pseudoseizure disorder were "severe" impairments but that these impairments singly or in combination, did not meet or medically equal one of the listed impairments in the Listing of Impairments. (R. 4S.) The ALJ found that Plaintiff had the residual functional capacity to occasionally lift or carry ten pounds, frequently lift or carry five pounds and sit, stand or walk for thirty minutes at a time with occasional balancing and stooping. Mentally, the ALJ found that Plaintiff had moderate limitations in the ability to understand, remember and carry out detailed instructions, interact with the public and co-workers and supervisors, respond appropriately to work pressures and changes in a usual setting. Based upon these findings the ALJ found that Plaintiff could return to past relevant work as a billing clerk and/or receptionist and therefore that she was not disabled.

The Court's evaluation of the medical record will focus upon Plaintiff's mental impairment, bypass surgery and stroke, as these impairments are the focus of Plaintiff's arguments.

---

[24] During the hearing, the ALJ asked Plaintiff if she had "any other jobs in the past 15 years other than the ones I'm going to read out now? Cashier, deli clerk, shopping – shipping order clerk, *billing clerk*, screen printer, *receptionist*, assembly line worker." Plaintiff answered, "No." R. 822-823.

The relevant medical records begin with Plaintiff's visit to Dr. Pedro F. Rodriguez on February 7, 2001 for treatment for a history of anxiety and panic attacks. (R. 303.) Dr. Rodriguez noted that Plaintiff had been prescribed Xanax and Zoloft for the previous three years for extreme anxiousness, neurosis, insomnia and tension headaches. *Id.* On February 27, 2001, Plaintiff reported continued anxiety, palpitations and insomnia. (R. 302.) Dr. Rodriguez prescribed Xanax and Paxil on a monthly basis through the rest of 2001. (R. 300-303.)

On August 13, 2001, Plaintiff underwent mental health counseling for depression. (R. 225.) During the session Plaintiff stated that she needed to be "Baker Acted." *Id.* The counselor noted that Plaintiff's hygiene was poor and the she sighed loudly every three to five minutes as if she was having respiratory difficulties. *Id.* Plaintiff's eyes appeared red and blood shot. *Id.* Plaintiff was visibly stressed and anxious. *Id.* Plaintiff told the counselor that she had been in therapy since her daughter was murdered and her father died in 1994. *Id.* On August 20, 2001, Plaintiff returned to counseling and discussed her ongoing struggle to deal with her daughter's murder in 1995. (R. 225.) Plaintiff's affect was depressed and frustrated. (R. 224.) Plaintiff was diagnosed with dysthymic disorder,[25] generalized anxiety, hypertension, migraines and was assigned a Global Assessment of Functioning ("GAF") of 32[26]. (R. 226.)

---

[25] Dysthymia is a chronic mood disorder manifested for most of the day, more days than not, accompanied by some of the following: poor appetite or overeating, insomnia or hypersomnia, low energy, low self-esteem, poor concentration, difficulty making decisions, and feelings of hopelessness. Lippincott, Williams & Wilkins, Stedman's Medical Dictionary (27th ed. 2000).

[26] The Global Assessment of Functioning Scale (GAF) ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, or unable to care for self). Diagnostic and Statistical Manual of Mental Disorders – Fourth Edition 32 (4th Ed. 1994). A score between 31-40 is defined as some impairment in reality testing for communication - speech is sat times illogical, obscure or irrelevant - (continued...)

The following week, Plaintiff went to the emergency room for suicidal thoughts and was taken into custody under the Baker Act. (R. 224) Plaintiff was diagnosed with ethanol intoxication and suicidal ideation. (R. 349.) The following day, Plaintiff was transferred to and evaluated by the Marion-Citrus Mental Health Center. (R. 479-487.) Plaintiff denied being suicidal and stated that she was "panicking and overwhelmed" by the stress of her family, particularly her mother dying two weeks prior. (R. 479-481.) The notes disclose that Plaintiff's appearance and speech were acceptable, her attitude was cooperative but withdrawn at times and her mood and affect were depressed and restricted. (R. 483.) The health care professionals at Marion-Citrus Mental Health Center concluded that Plaintiff had decreased symptoms of depression since being admitted and recommended continuity of her counseling as a treatment plan. (R. 487.)

Plaintiff continued counseling for depression through April 2002. (R. 224, 441-478.) On September 26, 2001, the counseling notes recite that Plaintiff was lacking in her personal hygiene probably due to depression and anxiety. (R. 224.) Plaintiff continued to express anger towards her family and refused to set boundaries. *Id.*

On April 22, 2002, Plaintiff was, again, admitted to the Marion Citrus Mental Center for a suicide attempt by lacerating her right wrist. (R. 442.) The notes state that Plaintiff was watching opera when the theme of the show reminder her of her daughter's murder. (R. 441.) At the time she was admitted, Plaintiff was prescribed several antidepressants including Paxil, Zoloft, Serzone and Prozac to deal with her depression. *Id.* Plaintiff was diagnosed with bipolar disorder type II and post traumatic stress

---

[26](...continued)
or major impairment in several areas, such as school, family relations, judgment, thinking or mood.

syndrome. (R. 469, 471, 478.) Upon discharge, Plaintiff was no longer in crisis nor a danger to her self. (R. 462.) She was assigned a GAF of 56. *Id.*

Again, on April 28, 2002, Plaintiff was admitted to the hospital after her husband found her unconscious. (R. 340-342.) The notes reveal that Plaintiff overdosed on her medication. (R. 338.) Plaintiff was transferred to the Intensive Care Unit and intubated. *Id.* Thereafter, Plaintiff was again taken into custody under the Baker Act and transferred to the Marion-Citrus Mental Health Center. *Id.* There, Plaintiff was diagnosed with unspecified psychosis, adjustment reaction/mixed emotions and depression. (R. 438.) Plaintiff was assigned a GAF of 30. *Id.* The health center recommended ongoing observation and treatment. (R. 437.) The notes through her discharge on May 6, 2002, reveal that Plaintiff was improving mentally. (R. 428-430.)

Dr. Anaimalaai V. Nanjundasamy, a psychiatrist with the Marion-Citrus Mental Health Center examined Plaintiff in August and September of 2002. (R. 395-400.) Dr. Nanjundasamy diagnosed Plaintiff with chronic left wrist swelling, hypertension, bipolar II disorder, depression, anxiety, migraine headaches and seizure disorder, and Plaintiff was assigned a GAF of 40. (R. 398.) Plaintiff was prescribed Lamictal, Paxil, Klonopin and bi-monthly follow-ups. (R. 395.)

State agency psychiatrist Alejandro F. Vergara, M.D., prepared a mental residual functional capacity assessment of Plaintiff on August 27, 2002. (R. 233-250.) Dr. Vergara assessed that Plaintiff was moderately limited in her abilities to carry out detailed instructions, to maintain attention and concentration for extended periods, to complete a normal workday and workweek without interruptions from psychologically based symptoms, to accept instructions and respond appropriately and to set realistic

goals or make plans independently of others. (R. 233.) Otherwise, Dr. Vergara noted that Plaintiff was not limited in any other ability, including her abilities to remember locations and work-like procedures, to understand and remember detailed instructions, to carry out short and simple instructions, to perform activities within a schedule, to maintain regular attendance, to be punctual with customary tolerances, to sustain ordinary routine without special supervision, to work in coordination with or proximity to others without being distracted by them and to make simple work-related decisions. (R. 233-234.) Dr. Vergara also noted that Plaintiff "may have difficulty with detailed, complex tasks and also accepting criticism from supervisors, but should be able to do simple repetitive type assignments, more so, if she remains compliant with medications." (R. 235.) Dr. Vergara also recorded that Plaintiff experienced one or two episodes of decompensation, each of an extended duration. (R. 247.)

On October 21, 2002, Plaintiff was again admitted to the Marion-Citrus Health Center for three days for suicidal ideation. (R. 373-394.) Plaintiff stated that she was depressed, suicidal and "afraid I will get to that point that I will actually do it." (R. 393.) Dr. Kevin Dahmen diagnosed Plaintiff with brief depressive reaction, seizures, headaches, depression and assigned her a GAF of 25. *Id.* Dr. Dahmen adjusted Plaintiff's medications. (R. 387.) Upon discharge, Plaintiff was diagnosed with Bipolar II disorder and was assigned a GAF of 40. (R. 382.)

Dr. Nanjundasamy reexamined Plaintiff on December 2, 2002. (R. 369-370.) The notes disclose that Plaintiff's hand was swollen from hitting the wall. (R. 370.) Plaintiff continued to have occasional outbursts of anger and poor sleep. *Id.*  Plaintiff's

medications were again adjusted. *Id.* Dr. Nanjundasamy assigned Plaintiff a GAF of 45. *Id.*

On February 4, 2003, H. Carol, ARNP responded to a questionnaire from the state agency regarding Plaintiff's conditions. (R. 271-272.) Plaintiff's mental status was noted as a depressed mood and affect. (R. 272.) Her quality of thinking was logical and goal oriented. *Id.* Plaintiff had no delusions, fair concentration and intact memory. *Id.* Nurse Carol noted that Plaintiff had decreased psychomotor activity and decreased social interactions. (R. 272.) Plaintiff's medications at that time included Trileptal, Wellbutrin, Klonopin and Trazadone. *Id.*

At the request of the state agency, Dr. Bortnick, a clinical psychologist, examined Plaintiff on March 3, 2003. (R. 273-275.) Dr. Bortnick noted that Plaintiff was cooperative, alert and oriented. (R. 274.) Her behavior, dress, speech and grooming was appropriate. *Id.* She had no signs of anxiety, pain, hallucinations, delusions of cognitive impairment. *Id.*  Plaintiff did cry briefly when talking about her daughter's death. *Id.*

Dr. Bortnick diagnosed Plaintiff with uncompleted bereavement and adjustment disorder with depressed mood in partial remission. (R. 275.) He noted that "[s]he has the mental-ability to work in some capacity" and "[s]he can manage her own finances." *Id.*

State agency clinical psychologist Val J. Bee filled out a mental residual functional capacity assessment for Plaintiff on March 30, 2003. (R. 276-295.) Bee assessed that Plaintiff was not significantly limited in most abilities. *Id.* However, Bee noted that Plaintiff was moderately limited in her abilities to complete a normal workday

and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, to understand, remember and carry out detailed instructions and to maintain attention and concentration for extended periods. (R. 276-277.) While Plaintiff was diagnosed with various affective disorders, depression and post traumatic stress syndrome, Bee noted that Plaintiff "appears able to meet the mental demands of well structured task activity." (R. 278-279.) Bee stated that Plaintiff's "current mental status from both CE and treating ARNP is essentially benign. Claimant appears capable of functional ADL's." (R. 294.)

From May through October 2003, Dr. Nanjundasamy treated Plaintiff for depression. (R. 306-308, 359-363.) On May 16, 2003, Plaintiff complained of increased mood swings and depression. (R. 363.) She was assigned a GAF of 45. *Id.* During her next visit, Plaintiff reported high stress. (R. 362.) Plaintiff continued to report mood swings and anxiety. (R. 361.) On October 17, 2002, Plaintiff reported that the depression and mood swings were better, and she no longer felt like a roller coaster. (R. 360.) Dr. Nanjundasamy noted that Plaintiff presented a good affect. *Id.* Plaintiff was assigned a GAF of 50. (R. 359.)

On October 20, 2003, Dr. Nanjundasamy prepared a mental capacity form for Plaintiff. (R. 306-308.) Dr. Nanjundasamy noted that Plaintiff suffered from a mood disturbance, emotional liability, suicidal ideations or attempts, decreased energy, manic syndrome, intrusive recollections of a traumatic experience, generalized persistent anxiety, and hostility and irritability. (R. 306.) Dr. Nanjundasamy described Plaintiff as alert and oriented with a calmed mood and constricted affect during her last visit. *Id.*

12

Plaintiff also exhibited non-pressured relevant speech, well organized thought processes and good eye contact. *Id.*

According to the form completed by Dr. Nanjundasamy , Plaintiff had fair ability to complete a normal workday and workweek without interruption, accept instructions and respond appropriately to criticism from supervisors, get along with co-workers or peers without unduly distracting them or exhibiting behavior extremes, respond appropriately to changes in a routine work setting, deal with normal hazards and take appropriate precautions due to difficulties with irritability and difficulty getting along with people and mood swings, social anxiety and post traumatic stress disorder. (R. 306-307.) Dr. Nanjundasamy also opined that Plaintiff suffered from moderate restrictions of activities of daily living and moderate difficulties in maintaining social functioning. (R. 308.) However, Dr. Nanjundasamy considered Plaintiff good at performing at a consistent pace without unreasonable number and length of rest periods, asking simple questions or requesting assistance, understanding, remembering and carrying out detailed instructions, setting realistic goals and dealing with stresses of semiskilled and skilled work. It was also noted that Plaintiff had experienced one or two episodes of deterioration or decompensation in work or work-like settings but these were not repeated nor continual. *Id.*

Dr. Nanjundasamy continued to treat Plaintiff through March 2004 for depression. (R. 354-358.) At her January 16, 2004 session, Plaintiff denied mood swings and angry outbursts. (R. 358.) She did, however, report feeling increasingly depressed, sad and isolated. *Id.* On March 1, 2004, Plaintiff reported that she was doing well. (R. 354.) Dr. Nanjundasamy assigned Plaintiff a GAF of 48. (R. 355.)

On May 18, 2004, Plaintiff was admitted to the Ocala Regional Medical Center for a three-week history of chest pains and associated shortness of breath. (R. 489.) Plaintiff underwent a cardiac catheterization on March 17, 2004, which revealed left main stenosis[27] of 95 percent as well as a 60 percent left anterior descending with an ejection fraction of 60 percent. *Id.* On May 18, 2004, Plaintiff underwent aortocoronary bypass surgery.[28] *Id.* Plaintiff was discharged on May 23, 2004 with a postoperative diagnosis of coronary artery disease. *Id.*

Four months later, on September 1, 2004, Plaintiff was admitted again to the hospital for right-sided weakness and slurred speech. (R. 541.) The right side of Plaintiff's face drooped and she was unable to smile. (R. 541-542.) However, Plaintiff was alert, fully oriented and able to recall three out of three objects in five minutes. (R. 556.) Her speech was characterized by moderate dysarthria and mildly decreased fluency. *Id.* A normal CT scan of the brain was taken that day, and her Carotid ultrasound examination was also normal. (R. 550, 556.) A treatment note from the following day states that Plaintiff was "feeling much better" with no complaints, her speech was "much clearer and fluent" and her right sided weakness had "improved considerably." (R. 561.) On September 3, 2004, another CT scan revealed a non-hemmorrhagic lacunar type infarct[29] involving the lentiform nucleus. (R. 552.) On

---

[27] A stricture of any canal or orifice, in this case, in the coronary. Lippincott, Williams & Wilkins, <u>Stedman's Medical Dictionary</u> (27th ed. 2000).

[28] Usually a vein graft or internal mammary artery, surgically interposed between the aorta and a coronary artery branch to coronary shunt blood beyond an obstruction. *Id*.

[29] A hemorrhagic infarct is an infarct red in color from infiltration of blood from collateral vessels into the necrotic area. *Id*.

September 6, 2004 Plaintiff was discharged for home health and physical therapy. (R.

558.)

## IV.  DISCUSSION

Plaintiff raises three issues on appeal. First, she argues that the ALJ erred by

assuming that Plaintiff's stroke and cardiac bypass surgery did not result in any residual

limitations and by failing to obtain updated medical records as to the impact of these

conditions on her ability to perform sedentary work. Secondly, Plaintiff argues that  the

ALJ improperly characterized Plaintiff's past relevant work as a "receptionist" and as a

"billing clerk." Lastly, Plaintiff contends that the ALJ failed to explain the basis for not

crediting the opinions of the state agency consulting psychologist and the treating

psychologist that Plaintiff suffered from episodes of decompensation.

**A.**    **The ALJ Properly Concluded that Plaintiff's Physical Impairments Did Not Result in Residual Limitations**

After review of the medical evidence, the ALJ determined that "the record fails to

show that the claimant has physical impairments that would preclude all work activity."

Plaintiff argues that the ALJ failed to properly develop the record by not obtaining

additional medical evidence following Plaintiff's May 2003 bypass and September 2004

stroke, which Plaintiff maintains would have shown additional limitations not included in

the ALJ's RFC determination.

"The burden is upon the claimant to demonstrate the existence of a disability as

defined under the Social Security Act."[30] Although the ALJ has the basic duty to develop

a full and fair record, the claimant bears the burden of proving evidence that she is

_____

[30] Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991).

disabled within the meaning of the Social Security Act.[31] In doing so, the claimant must provide medical evidence showing that she has an impairment and how severe the impairment was at the time claimant became disabled.[32] In the instant case, it was the Plaintiff, not the ALJ, who failed to demonstrate the existence of residual limitations due to the bypass and subsequent stroke.

Furthermore, the ALJ adequately stated his basis for finding that Plaintiff did not have any significant limitations. The ALJ acknowledged that Plaintiff underwent a coronary artery bypass on May 2004 and was thereafter released without complication. (R. 4R.) The ALJ also noted that the record showed no further complaints of chest pain. *Id.* As for the September 2004 stroke, the ALJ noted that "the record is without conflict that the claimant's speech problems and right sided weakness resolved within a period of a week with no indication of any residual symptoms. *Id.*

These statements are consistent with the record. On September 1, 2004, Plaintiff's CT scan and ultrasound came back normal. (R. 556.) Treatment notes from September 2, 2004 reveal that Plaintiff was feeling better overall and improving with regard to her speech and right-sided weakness. (R. 561.) While a subsequent CT scan revealed a non-hemorrhagic lacunar type infarct, there are no treatment notes or any other medical records documenting or explaining the significance of this medical finding. (R. 552.)

---

[31] 42 U.S.C. § 423(d)(5)(A) (2006); 20 C.F.R. § 404.1512(a),(c); Ellison v. Barnhart, 355 F.3d 1272, 1276 (11th Cir. 2003).

[32] 20 C.F.R. § 416.912 (a) and (c); Ellison, 355 F.3d at 1276.

16

Moreover, in his RFC determination, the ALJ took into account these very same limitations when restricting the types of work-related activities Plaintiff was able to perform. (R. 4Q-4U.) The ALJ appropriately noted that due to her physical impairments, "claimant has been unable to perform strenuous tasks and should avoid unprotected heights due to her history..." (R. 4T.) Thus, the ALJ properly reviewed the medical evidence in concluding that Plaintiff has the RFC for sedentary work.

**B.     The ALJ Erred in Determining that Plaintiff Could Return to her Past Relevant Work**

Even though the ALJ did not err with regard to his determination that Plaintiff's physical impairments did not result in residual limitations, the ALJ committed error at step four of the sequential evaluation in determining that Plaintiff could return to her past relevant work.  At step four, the ALJ found that Plaintiff had the RFC to perform sedentary work with limitations (R. 4T and U), and that Plaintiff could return to her past relevant work as a "billing clerk" or a "receptionist." (R. 4 U.) However, as discussed below, this finding by the ALJ is not supported by substantial evidence because there was no evidence in the record demonstrating that Plaintiff ever worked as a "billing clerk" or as a "receptionist."

In her initial application, Plaintiff listed her past relevant work as: clerk at a small store, deli clerk at a grocery store, order/bookkeeper clerk, bookkeeper and a telephone solicitor. Plaintiff described her past work as a bookkeeper as requiring lifting 50 pounds and also as the person who ran the office, which included moving screens, packing the finished product and delivering and unloading boxes. In the vocational report provided by Plaintiff she listed her past work as store clerk, cashier at a Jiffy Store, deli clerk at a

17

grocery store, shipping clerk, office clerk at a print shop, factory worker, and office clerk at a print shop. Notably, none of these descriptions are the same as the description for a receptionist or a billing clerk.

In addition to the fact that none of the descriptions of her past work match the ALJ's determination that Plaintiff previously worked as a receptionist and billing clerk, there was no information elicited from the vocational expert ("VE") supporting the classification of Plaintiff's past work as either a receptionist or as a billing clerk.  Indeed, the hypothetical questions posed to the VE by the ALJ all included either weight restrictions or sit/stand/walk responsibilities which were not consistent with the limits of the actual job responsibilities of Plaintiff's past jobs.

Apparently recognizing that the ALJ's finding regarding Plaintiff's past relevant work is problematic, the Commissioner suggests that the ALJ did not err because while "the VE may have erroneously called Plaintiff's jobs by the wrong name, she nevertheless was familiar with Plaintiff's vocational background as reflected in the record." While this *may* be the case, it is difficult, if not impossible, for this Court to make meaningful review of the ALJ's decision based upon what the VE may or may not have been thinking. Simply put, while the VE may have "called Plaintiff's jobs by the wrong name" the classification of occupations is critical to the determination of whether the Plaintiff can perform her past relevant work as she performed it or whether Plaintiff can perform her past relevant work as the job is generally performed. Had the ALJ discussed the physical and mental demands of Plaintiff's past relevant work as Plaintiff performed it or obtained testimony concerning the mental and physical demands of Plaintiff's past relevant work as generally performed the Court could conduct a

18

meaningful review of the evidence of record to ascertain whether it supports the analysis and conclusion of the ALJ. Here, because the ALJ never discussed the physical and mental demands of Plaintiff's past work or discussed the job responsibilities of "receptionist " or "billing clerk" the Court cannot conclude that substantial evidence supports the determination of the ALJ that Plaintiff could perform her past relevant work.

Moreover, while the Plaintiff bears the burden of proving she cannot meet the physical and mental demands of her past relevant work, either as she performed it in the past or as the work is generally performed in the national economy,[33] the ALJ, nontheless, must first develop a full and fair record concerning the issue.[34] In the absence of evidence of the physical or mental requirements and demands of a plaintiff's work, an ALJ cannot properly determine that plaintiff retains the residual functional capacity to perform the job.

The Commissioner attempts to avoid the problem with the ALJ's analysis of Plaintiff's past relevant work by arguing that because Plaintiff's past jobs were clerical in nature and the jobs of "billing clerk" and "receptionist" are also clerical in nature it follows that the Plaintiff was able to perform her past *kind* of work.[35]  The Commissioner goes on to surmise that because the VE testified that the jobs of receptionist and billing clerk are jobs that Plaintiff could perform, which are available in significant numbers in

---

[33] Jackson v. Bowen, 801 F.2d 1291, 1293 (11th Cir.1986).

[34] Schnorr v. Bowen, 816 F.2d 578, 681 (11th Cir.1987).

[35] *Citing* Jackson, 801 F.2d at 1293-94 for the proposition that "a claimant must show she not only cannot perform her specific job, but that she be unable to perform her past kind of work."

19

the national economy, there was support for the ALJ's conclusion that Plaintiff was not

disabled. This argument is flawed because it misstates the standard for past relevant

work at step four of the sequential analysis and further juxtaposes step four and step

five of the sequential evaluation that the ALJ is required to follow.

The standard at step four for determining whether a claimant can perform past

relevant work is not whether the Plaintiff can perform the *kind* of work she performed but

rather whether the Plaintiff can perform her job as she performed it *or* alternatively

whether the Plaintiff can perform her job as the job is generally performed in the

national economy.[36] This is different from analyzing whether Plaintiff can perform the

"kind" of job she previously performed.  Thus, because the relevant inquiry is not upon

the "kind" of job performed by the Plaintiff, the Commissioner's argument does not

salvage the flawed analysis by the ALJ.

Moreover, the fact that a VE may have testified that the Plaintiff could have

performed the job of receptionist or billing clerk, which jobs exist in significant numbers

in the national economy, cannot be used to salvage the ALJ's error at step four of the

sequential analysis. The identification of jobs that a claimant can perform which exist in

sufficient numbers in the national economy is relevant to step five of the sequential

analysis and not step four. In the instant case the ALJ stopped his analysis at step four

and never made a finding at step five. Accordingly, because the ALJ never reached step

five of the sequential analysis and the decision does not contain any reference to the

analysis at step five, the fact that the VE provided testimony as to the availability of

---

[36] *Id.*

these jobs in the national economy is insufficient to cure the error by the ALJ with regard to his finding that Plaintiff could return to her past relevant work as a "receptionist" and "billing clerk."

For these reasons, this action is due to be reversed and remanded so that the ALJ can properly identify Plaintiff's past relevant work and then address the physical and mental demands of Plaintiff's past relevant work to determine whether Plaintiff can perform these jobs with her particular mental and physical RFC.[37]

## V.  RECOMMENDATION

In view of the foregoing, it is respectfully **RECOMMENDED** that the decision of the Commissioner should be **REVERSED AND REMANDED** under sentence four of 42 U.S.C. § 405(g) to the Commissioner for the Administrative Law Judge to conduct further proceedings consistent with this report and recommendation.

**IN CHAMBERS** in Ocala, Florida, on September 27, 2007.

GARY R. JONES
United States Magistrate Judge

Copies to:
Honorable Wm. Terrell Hodges
Senior United States District Judge

All Counsel

---

[37] Because this case is due to be reversed and remanded for further proceedings as a result of the error by the ALJ in his analysis at step four, the Court need not address Plaintiff's final argument that the ALJ failed to explain his reasons for not accepting the opinions of the state agency psychiatrist or the treating physician, both of whom disclosed that Plaintiff suffered from one to two episodes of decompensation. As the Commissioner correctly points out in his brief even if the ALJ did not fully explain the reasons he did not accept the PRTF finding that Plaintiff had one or two episodes of decompensation, the error, if any, was harmless because it did not affect the outcome of the case in view of the fact that evidence of episodes of decompensation is primarily relevant to steps two and three of the sequential evaluation.